**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA**

| | |
|---|---|
| 1.  **LAUREN BENCE** | |
| **Plaintiff,** | |
| **vs.** | **Case No. 26-cv-00440-MTS** |
| 1.  **TEEN CHALLENGE OF OKLAHOMA, INC. d/b/a/ NEW LIFEHOUSE GIRLS ACADEMY, et. al.** | **ATTORNEY'S LIEN CLAIMED** **JURY TRIAL DEMANDED** |
| **Defendants.** | |

**COMPLAINT**

**NOW COMES** Plaintiff, Lauren Bence ("Plaintiff") by and through her counsel and for her cause of action against Defendants Teen Challenge of Oklahoma, Inc. d/b/a New Lifehouse Girls Academy ("TCOK"), alleges and states to the Court as follows:

### I.   INTRODUCTION

1. This action arises from the systemic abuse, neglect, exploitation, and forced labor of the Plaintiff while she was a minor and resident at TCOK, a facility purporting to provide faith-based mentorship, personal development, and character building to so-called "troubled teens." Plaintiff attended TCOK from December 28, 2014, until August 2015.

2. TCOK is a part of the larger Troubled Teen Industry ("TTI"), which is a notorious moniker that has developed to refer to the nationwide network of therapeutic programs

that market to so-called "troubled teens," or teens who were struggling with a myriad of mental health issues, and their families.

3. Like other TTI facilities, TCOK recruited children, including Plaintiff, through sophisticated marketing and messaging that promised families that their children would receive safe and therapeutic care in a structured and nurturing environment.

4. In reality, from the moment Plaintiff arrived at the TCOK facility she was abused, neglected, humiliated, assaulted, spiritually coerced, isolated, and forced to perform unpaid labor.

5. TCOK did this through a systemic method of coercion and control over Plaintiff and other students.

6. TCOK exercised pervasive control over Plaintiff by imposing extreme disciplinary measures, subjecting Plaintiff to repeated humiliation, degradation, and forced labor; requiring excessive and physically exhausting exercise, restricting Plaintiff's access to adequate food and basic hygiene, fostering fear and dependence by pitting residents against one another, and maintaining constant surveillance over Plaintiff's activities, communications, and relationships.

7. Most egregiously, TCOK maintained control over Plaintiff by pairing its rules and disciplinary structure with claims of constant, inescapable surveillance, using this as an instrument of psychological coercion and intimidation.

8. TCOK taught and reinforced to Plaintiff that her private thoughts and conduct were continuously monitored, and that any perceived disobedience, questioning of leadership, or noncompliance with organizational rules would result in undefined

adverse consequences framed in religious terms, in addition to the concrete, secular consequence of extending Plaintiff's mandatory time at the program. TCOK used this framework as a tool to compel compliance and suppress dissent.

9. TCOK ultimately profited from the abused and coerced forced labor of vulnerable children, including Plaintiff, for eight (8) months, while Plaintiff's family paid TCOK thousands of dollars.

## II.    THE PARTIES

10. Defendant TCOK is a 501(c)(3) non-profit organized under the laws of Oklahoma with a principal place of business at 36649 S. 510 Rd, Eucha, OK 74342, where it operates a residential treatment facility for adolescents.

11. Defendant TCOK can be served via its registered agent at 909 S. Meridian Ave. Oklahoma City, OK 73108.

12. Defendants John Doe entities 1-10 are entities, including but not limited to insurance companies, management companies, parent companies and other business entities, whose identities are presently unknown to Plaintiff, but who may be liable for the acts and omissions alleged herein.

## III. JURISDICTION AND VENUE

13. This Court has original jurisdiction pursuant to 28 U.S.C. § 1331 because this action involves claims arising from a federal question under 18 U.S.C. §§ 1581, 1589, 1590, 1594, 1595(a), and 2255.

14. This Court has general and specific jurisdiction over TCOK because its principal place of business is in Eucha, Oklahoma and the claims in this matter arise out of TCOK's contact with Oklahoma.

15. This Court has specific jurisdiction over the claims of the Plaintiff because her injuries arose from conduct that occurred at TCOK in Eucha, Oklahoma, and her claims directly relate to the Oklahoma based conduct.

16. Venue is proper in this Court pursuant to 18 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims alleged occurred within its judicial district.

**IV. STATEMEN OF FACTS**

17. Teen Challenge is part of the broader Adult & TCOK USA organization.

18. Teen Challenge USA is a Christian-centered network of addiction and mental health resources, that includes residential facilities, such as TCOK.

19. There are hundreds of Adult & Teen Challenge USA residential facilities in the United States.

20. Teen Challenge USA is a missionary department of the Assemblies of God U.S. Missions.

21. Assemblies of God pastor David Wilkerson founded Teen Challenge USA.

22. Teen Challenge USA is divided into regional chapters.

23. OKTC is part of the Teen Challenge USA Mid America ("Teen Challenge Mid America") and operates under the Teen Challenge USA Structure through an agreement with Teen Challenge USA.

24. Assemblies of God, through its ministers, employees, and volunteers, has a reportedly long history of abusing children and covering up the abuse.

25. In an ongoing series titled "Pastors and Prey," NBC News is detailing chronic and rampant abuse by Assemblies of God employees, ministers, and leaders.

26. The Pastors and Preys series documents a history dating back to at least the 1970s of Assemblies of God ministers being allowed to lead youth groups after substantiated reports of the ministers' physical and sexual abuse of minors.

27. NBC News reported in Pastors and Prey series that nearly 200 Assemblies of God pastors, church employees, and volunteer leaders has been accused of abuse over the last fifty years. The abuse involved more than 475 victims, with overwhelming majority of those victims being children.

28. NBC News reported in its Pastors and Prey series that abusive Assemblies of God ministers would coerce victims using scripture to warn the victims never to question spiritual leaders.

29. NBC News reported in its Pastors and Prey series that national Assemblies of God leaders have resisted implementing rules to protect against the abuse of minors because the rules could create legal liability for the organization.

30. Richard Hammar, the Assemblies of God's general counsel at the time, is quoted in the Pastors and Prey series as saying the legal risks of implementing such rules "outweighed the benefit."

31. TCOK employed Assemblies of God ministers and/or allowed Assemblies of God ministers to volunteer at TCOK.

32. TCOK never reported the abuse and exploitation of Plaintiffs to the appropriate authorities or the Plaintiff's families.

33. TCOK and Teen Challenge USA represented to Plaintiff and their families that TCOK would be a safe and therapeutic environment which would allow Plaintiff to heal.

34. Plaintiff came for a religious family and was, herself religious when she arrived at TCOK

35. Plaintiff's father chose TCOK and continued his daughter's enrollment and TCOK for eight (8) months because it was a religious organization that had been recommended to him through his church.

36. Teen Challenge USA promoted its programs as an affordable alternative to traditional boarding schools that anchored its treatment in the Christian faith.

37. Teen Challenge USA, promised to provide "troubled teens," or teens struggling with grief and mental health, like Plaintiff, with the help she needed.

38. Teen Challenge USA specifically marketed itself as tailored to teens struggling with behavior, motivational, or academic challenges and that its facilities provided 24/7 mentorship and care to residents, like Plaintiff.

39. TCOK made representations similar to those of Teen Challenge USA to Plaintiff and her family.

40. TCOK markets itself as a companion to families led by "understanding, direction, and a steady belief that transformation is possible."

41. TCOK markets itself as having a compassionate staff that will "love and care for your daughter as one of [their] own."

42. TCOK, like Teen Challenge USA, specifically marketed to girls who were uniquely vulnerable and susceptible to coercion.

43. TCOK, like Teen Challenge USA, specifically marketed to desperate families who were susceptible to deception and submission.

44. TCOK markets itself as having great success helping girls with a myriad of psychological, psychiatric, behavioral, and social issues, specifically stating it helps teens navigate self-image, a history of self-harm, addiction, mental health issues, and teens who have experienced profound trauma.

45. Upon information and belief, TCOK knew that it was marketing to girls, including Plaintiff, who were marginalized, at-risk, uniquely vulnerable to trauma and especially susceptible to coercion and abuse.

46. Plaintiff and her family relied on TCOK and Teen Challenge USA's representations when choosing TCOK and when choosing to continue enrollment for several months.

47. Teen Challenge USA and TCOK knew that Plaintiff had lost her mother at an early age and was having behavioral issues that made her vulnerable.

48. Teen Challenge USA and TCOK staff suggested and advertised that TCOK would help Plaintiff deal with the grief of losing her mom, address her emotional withdrawal, and behavioral issues.

49. Neither Teen Challenge USA or TCOK ever marketed the realities of residential treatments where discipline would often be equated with physical abuse, neglect, food, clothing, and hygiene deprivation, isolation, coercion, and forced labor.

50. Neither Teen Challenge USA or TCOK warned Plaintiff that Plaintiff would be subjected to physical abuse, neglect, deprivation of necessities, injury, coercion, and continuous forced labor as part of their program.

51. Neither Teen Challenge US or TCOK has ever confirmed, accepted, or acknowledged that Plaintiff along with the other residents, were subjected to physical abuse, neglect, deprivation, injury, coercion, isolation, and forced labor.

52. TCOK and Teen Challenge USA continue to promote and market their abusive practices as uniquely therapeutic and safe.

53. Plaintiff was minor for the entirety of her stay at TCOK.

54. As a condition of admitting Plaintiff, TCOK required Plaintiff's father to give TCOK exclusive and unconditional control and custody of Plaintiff for the entirety of her stay at TCOK facilities.

55. As a condition of admitting Plaintiff, TCOK required Plaintiff's father to promise not to interfere with TCOK's custody or management of Plaintiff while Plaintiff was at TCOK

56. Immediately upon admittance, TCOK limited Plaintiff's communication with the outside world including conversations with her own family.

57. TCOK's immediate action towards new residents was to enforce a pattern of control and isolation that ensured compliance through coercion and punishment.

58. TCOK controlled residents through coercion, emotional manipulation, psychological and physical abuse.

59. At TCOK, discipline and consequences were the centerpiece of treatment, designed to psychologically break down vulnerable children into compliance starting the moment they arrived.

60. Immediately upon admittance, TCOK stripped new residents, including Plaintiff, of all communication, necessities, belongings, or connection.

61. Immediately upon admittance, TCOK stripped Plaintiff of all her belongings and held them hostage as prizes for her to earn through her labor.

62. TCOK referred to rights and necessities as privileges to be earned and doled out at TCOK's whim.

63. Privileges included speaking, using the bathroom, showering, eating, access to hygiene products, communicating with family, and sleeping.

64. TCOK tied all privileges to a level system, wherein privileges were "earned" as residents progressed up through levels beginning at Level 1.

65. At level 1, Plaintiff, as all new residents, was immediately placed on "Silence," a status which prohibited her from speaking to anyone but two individuals at the facility.

66. Upon arrival, residents, like Plaintiff, were assigned one staff member and one higher level student who would become the only two people with whom communication was sanctioned.

67. TCOK trained higher level residents to report on their fellow residents and they were threatened with level regression if they failed to comply with reporting expectations.

68. Plaintiff was on complete Silence for the first three (3) days at TCOK, but the practice was used as punishment against her several more times.

69. TCOK would add on time to a resident's Silence designation for disciplinary infractions or speaking out of turn. Some residents were on Silence for weeks at a time.

70. TCOK would use public humiliation by fellow residents as punishment for infractions.

71. TCOK would, on their own whim, enforce a "6 foot rule" which forbade Plaintiff from being six (6) feet or closer to several of the other residents, despite the fact that she shared her dormitory with twenty-three (23) other girls.

72. TCOK removed privileges as punishment and would move children back in the level system as punishment.

73. TCOK placed residents, on "D level", if they were considered to be a run risk and they would be forced to wear a bright orange t-shirt and given no socks or hair tie.

74. TCOK placed residents on restriction of privileges as punishment, withholding personal belongings, hygiene product, and human contact.

75. TCOK would use isolation, excessive physical exercise in the summer heat, constant surveillance, Silence, and forced labor as punishment for infractions.

76. The only way out of restriction of privilege was complete and unquestioning compliance with TCOK's commands and rules.

77. The only way for Plaintiffs to move up levels and to sustain upward movement through the levels was complete obedience with TCOK's commands and rules.

78. TCOK required students to complete all levels before they could graduate or before TCOK would recommend departure to the residents' families.

79. Plaintiff believed her complete obedience and compliance with TCOK's requirements was the only way for her to ever leave the facility.

80. TCOK doled out punishment as described herein, when staff *believed* a resident broke a rule.

81. TCOK punished fellow residents for "condoning" or failing to report infractions to TCOK staff.

82. TCOK training led to girls lying to TCOK about infractions to curry favor with staff, level up, and avoid punishment.

83. TCOK prohibited its residents from speaking to girls in lower levels.

84. This training created a hostile and untrusting environment that was not therapeutic.

85. TCOK created a hostile environment in which each resident's progression depended on their willingness to punish and retaliate against other residents.

86. TCOK's rules changed daily, sometimes hourly, and staff enforced them arbitrarily and with favoritism.

87. Plaintiff and her fellow residents were punished for vague conceptual violations like ungodly behavior.

88. TCOK used labor and physical exercise as punishment and the threat of it to enforce compliance.

89. TCOK staff would violently restrain young girls who broke the rules. Often, several adults would be holding down girls as young as thirteen (13) years old.

90. TCOK violently restrained teens publicly as a threat to other students.

91. TCOK forced students to engage in punitive and excessive exercise.

92. As punishment, TCOK forced residents, including Plaintiff to do wall sits, push-ups, burpees, and to run laps to the point of vomiting, exhaustion, and even fainting.

93. TCOK restrained access to food as punishment.

94. TCOK allowed only one shower a day per resident to last no more than ten (10) minutes, even on days when the residents had been put through extreme exercise and labor in the heat.

95. TCOK staff members sometimes forced residents to use the bathroom while being supervised.

96. Despite having no history of addiction or drug use of any kind, Plaintiff was forced to have a staff member check the stall before and after she used it, without being able to flush.

97. TCOK kept all of its residents on strict food rations regardless of dietary or nutritionary needs and would force the residents to finish all of their meal even if they were sick or indisposed.

98. TCOK served the girls expired food.

99. TCOK delayed medical treatment to its residents.

100. During her time at TCOK, Plaintiff broke her wrist and was denied treatment for two (2) days, at which time a fracture was found.

101. TCOK administered what it called Character Qualities to residents as a leveling requirement.

102. Character Qualities required residents to handwrite scripture passages by hand hundreds of times consecutively, often for hours without rest, resulting in physical exhaustion, hand cramping, and blistering.

103. Additional Character Qualities would be doled out as punishment. If they were not completed to the supervising staff's standards, they were to be repeated.

104. Plaintiff was forced to continue Character Qualities, and even assigned additional ones as punishment, after the wrist in her writing hand (right) was broken and in a cast.

105. TCOK required Plaintiff and other residents to confess their sins in front of all the other residents. Refusal to participate resulted in punishment.

106. TCOK required residents to participate in "forced breakthroughs" wherein TCOK staff berated and encouraged fellow residents to berate a chosen resident until she broke and admitted alleged spiritual failings. TCOK would then shame residents after their admissions. Refusal to participate in forced breakthroughs resulted in punishment.

107. TCOK markets these forced confessionals, and public humiliations are guided group conversations where residents can reflect on their journey and gain insight from peers while building their confidence.

108. TCOK markets that it does not condone shaming or isolation.

109. TCOK humiliated and forced Plaintiff into false confessions.

110. TCOK cut all direct contact between Plaintiff and her family for the first month at TCOK, limiting her to hand-written letters that would be reviewed and surveilled.

111. TCOK staff screened all outgoing letters and would force residents to re-write letters that mentioned anything negative about TCOK.

112. TCOK refused to mail unedited letters to students' families.

113. TCOK trained their residents that they were not to speak about the program or the participants at all.

114. Plaintiff was refused mailing of a letter and told to keep it for her journal instead.

115. Once Plaintiff earned the privilege of calling her family, only two (2) calls to last no more than ten (10) minutes were authorized per week.

116. All calls were recorded and TCOK staff listened in on all calls and would pause or end calls if Plaintiff mentioned anything negative about TCOK.

117. TCOK punished residents who spoke negatively about TCOK to their families.

118. TCOK preemptively told parents during the admission process that their children would lie about the condition of the program as a ploy to go home.

119. TCOK warned parents against believing their own children's "manipulations" and Plaintiff's father relied on TCOK's alleged expertise and heeded TCOK's warning.

120. TCOK restricted resident's ability to speak honestly with their families to keep residents enrolled, tuitions paid, and students working.

121. TCOK markets that it will allow students to withdraw from the program with parent approval.

122. TCOK markets that it is committed to fostering communication between residents and their families.

123. TCOK actively prevented withdrawal by preemptively warning parents against believing their children, restricting, and monitoring resident's communications with parents.

124. TCOK's rules, surveillance, and practices created an environment of fear, conflict, and distrust amongst the residents. TCOK forced at-risk children, including Plaintiff, to live in this environment for months which left them in a state of constant hypervigilance, fear, and isolation.

125. TCOK required all residents to provide free labor to various nearby ventures.

126. TCOK required residents, including Plaintiff, to work at nearby for-profit businesses unaffiliated with any bona fide educational or therapeutic purpose, including a seasonal fireworks stand.

127. Plaintiff and other residents were required to work shifts of approximately twelve hours at the fireworks stand on Saturdays, with no meal breaks, rest breaks, or other respite provided during the entirety of each shift.

128. On some occasions, Plaintiff and other residents were removed from their regularly scheduled academic instruction on Fridays in order to be transported to and made to work additional shifts at the fireworks stand, further depriving them of educational instruction they were otherwise represented to be receiving as residents of TCOK.

129. Plaintiff received no compensation for this labor

130. Plaintiff's participation in this labor was not voluntary. Residents who declined or resisted being sent to work at the fireworks stand, or who failed to complete their assigned shifts, were subject to additional labor, withdrawal of "privileges" or otherwise punished consistent with the broader scheme described above by which TCOK used threatened and actual adverse consequences to compel residents' labor.

131. On information and belief, Defendant TCOK derived financial benefit from the labor Plaintiff and other residents performed at the fireworks stand and other for-profit businesses, whether through direct payment, a share of proceeds, or other consideration paid to TCOK in exchange for supplying resident labor.

132. TCOK's premises also included an amphitheater at which TCOK or an affiliate staged animal shows and concerts open to paying members of the public.

133. These events were not free community programming. TCOK sold tickets to attendees for admission to the animal shows and concerts held at the amphitheater.

134. TCOK required Plaintiff and other residents to provide the labor necessary to stage these events, including setting up the venue prior to each event, staffing and running the events, and cleaning the amphitheater and surrounding grounds afterward, without compensation.

135. TCOK further required Plaintiff and other residents to care for and handle animals used in these shows, including exotic and large animals such as camels, despite providing residents with no training in animal handling, animal husbandry, or safety procedures appropriate to the species involved.

136. The TCOK staff members assigned to lead and supervise residents in the care and handling of these animals likewise did not appear to have received any meaningful training in animal handling or safety.

137. On information and belief, TCOK did not require or verify that its staff possessed the qualifications, training, or experience necessary to safely handle exotic or large animals or to supervise untrained minors in doing so.

138. TCOK marketed and advertised its animal programming to residents, their families, and the public as a therapeutic tool, representing that contact with the animals provided residents with emotional, psychological, and/or behavioral therapeutic benefit.

139. In practice, Plaintiff's involvement with the animals consisted primarily of uncompensated custodial labor — feeding, cleaning enclosures, and other maintenance work — rather than any structured or supervised therapeutic interaction. Plaintiff neither received, nor observed any other resident receive, any therapeutic benefit from this labor.

140. On information and believe, no licensed or qualified therapeutic professional supervised or facilitated the animal-related tasks residents were required to perform.

141. Plaintiff's and other residents' attendance at the shows and concerts themselves was treated by TCOK as a privilege to be earned through compliance and good behavior, rather than as a benefit provided to residents as a matter of course.

142. Even when permitted to attend a show or concert as a reward for good behavior, Plaintiff and other residents were instructed that they were not to make eye contact with any member of the paying public in attendance.

143. On information and belief, Defendant TCOK derived financial benefit from ticket and concession sales to these events, which were produced, staffed, and cleaned using the uncompensated labor of residents, including Plaintiff.

144. TCOK to this day staffs the firework stand, amphitheater shows, and the Brush Creek Bazaar with the unpaid labor of children.

145. TCOK punished and threatened to punish any residents, including Plaintiff, who did not comply with TCOK's forced labor demands.

146. In addition to the labor TCOK provided for others, TCOK required all residents to perform hours of daily manual labor in the facilities without pay.

147. At TCOK all cleaning and maintenance of the facilities was undertaken by the residents in a strict chore rotation. Although this included age-appropriate tasks such as cleaning the bathrooms and making their beds, the chore task also included the maintaining, cleaning, and staffing of a commercial kitchen without training. Additionally, some of the chores would be entirely arbitrary, purposeless, and endless such as picking up sticks and relocating rocks.

148. TCOK forced Plaintiff to perform the aforementioned labor while she was a resident.

149. All of the labor and more was involuntary for Plaintiff.

150. TCOK punished students, including Plaintiff, whenever TCOK found their work unsatisfactory, even the arbitrary tasks.

151. All cleaning and labor was monitored by a TCOK appointed supervisor who would always be a fellow resident.

152. Residents performed the forced labor described herein for at least four (4) hours every weekday and at least six (6) hours each weekend day.

153. TCOK forced students to perform labor while sick or injured.

154. Plaintiff performed labor while in her cast from her broken wrist.

155. TCOK would take away privileges and threaten to take away privileges from residents who refused to work or those who performed the work unsatisfactorily.

156. Refusing work, or performing unsatisfactorily, resulted in losing access to food, hygiene products, permission to speak, shaming, humiliation, excessive exercise, and isolation. Plaintiff believed she would suffer these punishments at any time if she refused to work.

157. TCOK shamed and humiliated students who did not comply fully with its forced labor demands.

158. Plaintiff believed she would be punished with excessive exercise or otherwise if she refused to work.

159. Plaintiff can't remember any TCOK employees performing maintenance or cleaning of the facility.

160. As part of the TCOK program, residents, including Plaintiff, were forced to go on a mission trip to Rwanda.

161. Plaintiff was given no information about what the mission trip would entail or what rules she would be living by.

162. In preparation for the mission trip, TCOK pulled Plaintiff and other residents out of school and all other regular programming for a period of approximately two weeks

during which residents were required to learn and rehearse songs and choreographed dances to be performed on the trip.

163. During this two-week period, rehearsal of the songs and dances was mandatory and occupied the entirety of residents' days pursuant to a strict, staff-imposed schedule, to the exclusion of academic instruction, therapeutic programming, and other activities residents were otherwise represented to be receiving as part of their placement at TCOK.

164. Residents, including Plaintiff, were required to repeat the same songs and dances for hours at a time, often for the majority of the day, with no rest breaks permitted between repetitions until staff determined that residents' performance was satisfactory.

165. TCOK did not provide any educational credit, therapeutic justification, or other legitimate programmatic benefit to residents commensurate with the two weeks of academic instruction and other programming residents lost during each rehearsal period.

166. On information and belief, the songs, dances, and performances rehearsed and staged during these mission trips served a fundraising, promotional, and/or public-relations function for TCOK.

167. Plaintiff was forced to evangelize, sing, dance and give testimonials in Rwanda as part of the so-called mission trip.

168. Plaintiff was forced to staff and work at a wedding while in Rwanda.

169. Plaintiff was not allowed to have any communication with family while outside of the country.

170. While in Rwanda, Plaintiff was forced to visit memorials of the Rwandan Genocide. These memorials would often depict violent and gruesome deaths that further traumatized Plaintiff.

171. Plaintiff was punished if she failed to participate to TCOK's standards.

172. TCOK never paid Plaintiff or her family for the hundred of hours of forced labor the Plaintiff performed at the direction of TCOK.

173. Plaintiff's family paid tuition for every month of labor that Plaintiff performed at TCOK.

174. Plaintiff was forced to raise the money for her own mission trip.

175. Through the conduct described above, TCOK obtained a direct and substantial economic benefit from the uncompensated labor of Plaintiff and other residents, which allowed TCOK to avoid costs it would otherwise have incurred to hire paid staff or third-party contractors to perform the same functions, including:

> a. **Custodial and maintenance services**, including cleanup of the amphitheater, grounds, and concession areas following ticketed events;
>
> b. **Skilled and unskilled labor at revenue-generating operations**, including staffing the fireworks stand and cleaning after amphitheater, ticketed events;
>
> c. **Animal care services**, including feeding, cleaning, and maintenance associated with the animals used in TCOK's ticketed shows;

d. **Event staffing and coordination**, including setup, ticketing, and operation of the amphitheater shows and concerts;

e. **Marketing, fundraising, and public relations**, including performances staged by residents during mission trips that were used to solicit donations and/or promote TCOK; and

f. **Resident supervision and behavioral management**, insofar as TCOK's system of conditioning access to privileges (such as attendance at shows) on compliance functioned as a mechanism of institutional control that would otherwise have required additional paid supervisory staff.

176. Even to the extent TCOK did not directly retain monetary proceeds from residents' labor at the fireworks stand and other third-party businesses, TCOK nonetheless derived a material benefit from that labor in the form of enhanced community goodwill, reputational credibility, and promotional value. By supplying free resident labor to these businesses and events, TCOK cultivated relationships and public perception that furthered its ability to attract donors, referrals, and paying or placing families, constituting a benefit "of value" within the meaning of 18 U.S.C. § 1595(a).

177. TCOK disguised the work as discipline that promoted a positive peer culture, when in reality the labor served primarily to reduce the facility's overhead and further the goals of the organization by replacing paid staff with unpaid child labor.

178. Plaintiff was a minor at all times during her placement at TCOK, from December 2014 to August 2015. She reached the age of majority on July 15, 2016.

179. Because Plaintiff "was a minor at the time of the alleged offense," the ten-year limitations period under 18 U.S.C § 1595(c) did not begin to run until she reached majority. 18 U.S.C § 1595(c)(2). This action is therefore timely, having been commenced within ten (10) years of her eighteenth (18) birthday.

180. To the extent this action includes a claim under 18 U.S.C. § 2255, that claim is independently timely, as § 2255(b) imposes no time limit whatsoever on when such an action may be commenced.

## V. CAUSES OF ACTION

## COUNT ONE – Violation of Trafficking Victims Protection Reauthorization Acct (TVPRA) 18 U.S.C. §§ 1595 AND 1584

181. Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs of this Complaint as if restated in full herein.

182. The Trafficking Victims Protection Reauthorization Act, 18 U.S.C. § 1595(a) provides a civil cause of action to trafficking victims like Plaintiff against "whoever knowingly benefits, or attempts or conspires to benefit, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in . . . " violation of any section of 18 U.S.C. §§ 1581, *et seq*.

183. Plaintiff was a victim of forced labor trafficking in violation of 18 U.S.C. § 1584.

184. Under 18 U.S.C § 1584, it is unlawful to knowingly and willfully hold another person to involuntary servitude.

185. Defendants knowingly and willfully held Plaintiff in involuntary servitude in several ways, including but not limited to the following:

   a. Creating and maintaining a system wherein Plaintiff and all other residents were forced to work against their will;

   b. Requiring Plaintiff and other trafficking victims to work excessive hours every day;

   c. Retaining the financial proceeds from Plaintiff's labor and that of other trafficking victims while providing Plaintiffs or other students with no compensation;

   d. Maintaining complete control over Plaintiff's and other survivor's living conditions, food, hygiene, and communications with family and expressly conditioning access to all of it on compliance with forced labor demands;

   e. Defendants received financial benefit from the forced labor of Plaintiff and other survivors in violation of 18 U.S.C. § 1584.

186. Defendants saved money by using unpaid labor to maintain TCOK.

187. Defendants received a financial benefit from running a business that recruited, exploited, and manipulated children from desperate families and held them in involuntary servitude under the guise of therapeutic help and religious guidance.

188. Plaintiff suffered damages as a result of Defendant's conduct.

189. Plaintiff is entitled to compensatory and punitive damages, restitution, attorneys' fees, cost, and any other relief deemed appropriate.

## COUNT TWO: Violations of Trafficking Victims Protection Reauthorization Act (TVPRA) 18 U.S.C §§ 1595 and 1589

190. Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs of this Complaint as if restated in full herein.

191. The Trafficking Victims Protection Reauthorization Act, 18 U.S.C. § 1595(a) provides a civil cause of action to trafficking victims like Plaintiff against "whoever knowingly benefits, or attempts or conspires to benefit, financially or by receiving anything of value from participation in a venture which that person knew or should have known was engaged in . . ." violation of any section of 18 U.S.C. §§ 1581, *et seq.*

192. Plaintiff was a victim of forced labor through threats of harm in violation of 18 U.S.C. § 1589.

193. Under 18 U.S.C. § 1589(a), it is unlawful to knowingly provide of obtain labor or services by means of : (1) force, threats of force, physical restraint, or threats of physical restraint; (2) serious harm or threats of serious harm;; (3) abuse or threatened abuse of law or legal process; or (4) any scheme, plan, or pattern intended to cause a person to believe that they would suffer serious harm or physical restraint if they did not perform such labor and services.

25

194. Under 18 U.S.C. § 1589(b), it is also unlawful to "knowingly benefit, financially or by receiving anything of value, from participation in a venture which has engaged in the providing or obtaining of labor or services" by the means described in subsection (a).

195. 18 U.S.C. § 1589(c)(2) the term "serious harm" means "any harm whether physical or nonphysical, including psychological, financial, reputational harm . . ."

196. Defendant violated 18 U.S.C. § 1589 because they obtained Plaintiff's and other survivors' labor through extreme emotional abuse, serious harm in the way of malnutrition, deprivation, psychological harm, physical harm, force, and threats of serious harm.

197. Defendants further violated 18 U.S.C. § 1589 by employing a systematic discipline system as a scheme to cause Plaintiff and other survivors to believe they would be subjected to serious harm if they refused to work.

198. Defendant violated 28 U.S.C. § 1589 in several ways, including but not limited to the following:

   a. Creating, implementing and maintaining a systematic discipline process that used physical and psychological abuse and threats of physical and psychological abuse to coerce and obtain compliance for forced labor;

   b. Threatening to restrict and restricting Plaintiff's access to food, water, housing, and her own belongings if she did not comply;

   c. Threatening to restrict and restricting Plaintiff's access to communication with family if she did not comply;

d. Physically harming students who tried to run or resist in front of Plaintiff and other survivors;

e. Threatening Plaintiff with discipline, and doling out discipline, that included forced labor, forced exercise, and psychological punishment if they did not perform unpaid labor;

f. Shaming and humiliating students who did not comply in front of Plaintiff and other survivors as a threat to Plaintiff;

g. Restricting and monitoring Plaintiff's contact with family members to ensure continuing compliance with forced labor and the steady flow of tuition payments;

h. Threatening to restrict and restricting Plaintiff's ability to speak if they did not comply.

199. Defendant profited financially through these violations, and , as such, is liable under 18 U.S.C. §§ 1589(b), 1595(a).

200. Defendants knowingly received a financial benefit from their violations of the TVPRA by receiving unpaid labor and services that benefitted TCOK.

201. Plaintiffs suffered damages as a result of Defendant's conduct.

202. Defendants received financial benefit from running a business that recruited, exploited, and manipulated children from desperate families and obtained the children's labor through serious harm and threats of serious harm under the guise of help.

203. Plaintiff is entitled to compensatory and punitive damages, restitution, attorneys' fees, costs, and any other relief deemed appropriate.

### COUNT THREE: Violations of Trafficking Victims Protection Reauthorization Act (TVPRA) 18 U.S.C §§ 1595 and 1590

204. Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs of this Complaint as if restated in full herein

205. The Trafficking Victims Protection Reauthorization Act, 18 U.S.C. § 1595(a) provides a civil cause of action to trafficking victims like Plaintiff against "whoever knowingly benefits, or attempts or conspires to benefit, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in  . . ." violation of any section of 18 U.S.C. §§ 158,1 *et seq.*

206. Defendant violated 18 U.S.C. § 1590 in several ways, including but not limited to the following:

   a. Creating and disseminating misleading marketing materials that advertise TCOK as offering legitimate and uniquely therapeutic services to recruit Plaintiff and other survivors;

   b. Misrepresenting that discipline would be therapeutic and that labor would be voluntary;

   c. Specifically targeting vulnerable children and their desperate families;

   d. Housing Plaintiff and other survivors at all relevant times during which all violations occurred;

   e. Conditioning Plaintiff's housing on compliance with forced labor demands;

28

f. Controlling all aspects of Plaintiff's communication with the outside world and editing letters to remove any negative mention of TOCK or the forced labor;

g. Coercing Plaintiff and other survivors to provide labor through comprehensive physical, psychological, and spiritual means;

h. Monitoring and controlling Plaintiff's and other survivors' behavior during forced labor to ensure continued compliance;

i. Transporting Plaintiff to churches and outside of the country to perform forced unpaid labor and forced unpaid fundraising activities.

207. Defendant knowingly received a financial benefit from its violation of the TVPRA by receiving unpaid labor and services that benefitted Defendant.

208. Defendant saved money by using unpaid labor to maintain TCOK.

209. Plaintiff suffered damages as described herein as a result of Defendant's conduct.

210. Defendant received financial benefit from running businesses that recruited, exploited, and manipulated children from desperate families and forced those children into unpaid labor under the guise of help.

211. Plaintiff is entitled to compensatory and punitive damages, restitution, attorneys' fess, costs, and any other relief deemed appropriate.

## COUNT FOUR: Attempted Violations and Conspiracy to Commit Violations of TVPRA 18 U.S.C §§ 1584, 1589, 1590, 1594, AND 1595.

212. Plaintiff herby incorporates by reference the allegations contained in the preceding paragraphs of this Complaint as if restated in full herein

213. While, as alleged above, Defendant violated 18 U.S.C. §§ 1584, 1589, and 1590, in the alternative, Defendant is liable because it attempted to and did conspire to violate 18 U.S.C. §§ 1584, 1589, and 1590.

214. The Trafficking Victims Protection Reauthorization Act, 18 U.S.C. § 1595(a) provides a civil cause of action to trafficking victims like Plaintiff against "whoever knowingly benefits, or attempts or conspires to benefit, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in . . ." violation of any section of 18 U.S.C. §§ 158,1 *et seq.*

215. Under 18 U.S.C. § 1594(a)(b) whoever attempts or conspires to violate §§ 1584, 1589, or 1590 shall be punished in the same manner as a completed violation of each section.

216. Defendant intended to violate, took the necessary steps to violate, and conspired to violate 18 U.S.C. §§ 1584, 1589, and 1590, as more fully alleged herein.

217. Plaintiff suffered damages as described herein as a result of Defendant's conduct.

218. Plaintiff is entitled to compensatory and punitive damages, restitution, attorneys' fess, costs, and any other relief deemed appropriate.

### COUNT FIVE: Violations of TVPRA 18 U.S.C §§ 1595 and 1590

219. Plaintiff herby incorporates by reference the allegations contained in the preceding paragraphs of this Complaint as if restated in full herein

220. The Child Abuse Victims' Rights Act (18 U.S.C. § 2255) provides a civil remedy for minors who suffer personal injuries as a result of certain federal crimes, including forced labor under 18 U.S.C. §§ 1589 and 1590.

221. Plaintiff was a minor while at TCOK.

222. Plaintiff suffered personal injuries, as described herein, as a result of Defendant's TVPRA violations.

223. Under 18 U.S.C. § 2255, Defendant's TVPRA violations entitle Plaintiff to recover the following: actual damages, liquidated damages, in the amount of $150,000, attorney's fees, costs of litigation, punitive damages, and all other equitable relief as the court determines to be appropriate.

## VI. JURY DEMAND

224. The Plaintiff demands a trial by jury on all issues so triable by law.

## VI. DAMAGES

225. As a direct result of TCOK's conduct, Plaintiff has suffered injuries, including but not limited to the following:

    a. Severe psychological distress;

    b. Delayed academic progress;

    c. Lost wages and economic exploitation as a result of performing thousands of hours of unpaid forced labor;

    d. Loss of trust of therapeutic institutions;

    e. Loss of trust of any hierarchy of power;

    f. Loss of faith and connection to God, her family, and her church;

    g. Heightened sense of shame and lower self-esteem;

h. Physical injuries including persistent sleep disturbances and long term injury to her right wrist ; and

i. Difficulty forming and maintaining healthy relationships.

**WHEREFORE,** Plaintiff prays for relief as follows:

a. Actual damages for Plaintiff's personal injuries included but not limited to, insomnia, injuries to her wrist, and psychological harm,

b. Statutory damages of $150,000 per violation pursuant to 18 U.S.C § 2255 for Plaintiff,

c. The cost of this action

And that the Court grant Plaintiff such further relief which the Court deems just and proper.

Dated: Wednesday, July 15, 2026

Respectfully submitted,

**RED DIRT LEGAL, PLLC**

By: _s/Laura A. Martinez_
A. Laurie Koller, OBA #16857
Laura Martinez, OBA #35173
2504 E. 21st Street
Tulsa, OK 74114
laurie@reddirtlegal.com
laura@reddirtlegal.com
(405) 527-8001
**Attorneys for Plaintiff**

32